## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION<br>100 F Street, N.E.<br>Washington, D.C. 20549,<br><br>      Plaintiff,<br><br>v.<br><br>ALAN WEINBERG and WEINBERG & BAER LLC,<br><br>      Defendants. | Case No. 18-360<br><br>COMPLAINT |

Plaintiff, the United States Securities and Exchange Commission ("Commission") alleges for its Complaint against defendants Alan Weinberg ("Weinberg") and Weinberg & Baer LLC ("W&B") that:

### SUMMARY

1.      This action concerns Weinberg's and W&B's aiding and abetting a fraudulent scheme to create and sell public shell companies.

2.      This "shell factory" was operated from Israel by Sharone Perlstein ("Perlstein"), Hadas Yaron ("Yaron"), and Aric Swartz ("Swartz") (collectively, the "Perlstein Group").

3.      Between 2010 and 2014, the Perlstein Group created at least fifteen fraudulent shell companies, which had virtually no assets or operations and no legitimate business purpose. With the assistance of an attorney and an accountant, the Perlstein Group then conducted sham U.S. initial public offerings of certain of the shell companies' securities, and then sold (or attempted to sell) certain of the shell companies to buyers seeking shell companies with publicly-traded shares.

4.      Weinberg was the engagement partner for W&B's audits of the financial statements of at least seven of these shell companies.

5.      Weinberg knew, or was reckless in not knowing, that the Perlstein Group was committing fraud.  Although Perlstein or Yaron personally had retained Weinberg to perform the audit work for the shell companies and Weinberg routinely relied on the Perlstein Group, and not the purported officers or directors of the respective shell companies, to provide him with information about the issuers, Weinberg neither questioned the Perlstein Group's role with regard to those companies, nor took reasonable steps to investigate whether the purported directors and officers actually served in those capacities, or even to confirm that they existed.

6.      In violation of professional standards, Weinberg and W&B failed to implement reasonable client-acceptance and continuance procedures and demonstrated virtually no professional skepticism regarding the Perlstein Group's relationship with the shell companies.

7.      Weinberg and W&B also failed to (a) properly audit related-party transactions between the Perlstein Group and the shell companies, and (b) maintain sufficient work paper documentation of their audits of the shell companies.

8.      By issuing clean audit reports for at least seven of the shell companies, despite numerous audit failures and red flags that should have alerted them that they were enabling a fraud, Weinberg and W&B substantially assisted the Perlstein Group in perpetrating their fraud.

9.      Despite their repeated failed to adhere to auditing standards promulgated by the Public Company Accounting Oversight Board ("PCAOB Standards"), Weinberg and W&B issued numerous audit reports falsely stating that those audits had been performed in accordance with PCAOB Standards.  The PCAOB was created by Congress and establishes auditing and related

professional practice standards for registered public accounting firms to follow in the preparation and issuance of audit reports.

10.     By engaging in the conduct described in this Complaint, Weinberg and W&B aided and abetted violations of Section 17(a) of the Securities Act of 1933 ("Securities Act"), and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] by Perlstein, Swartz, and Yaron.  Weinberg and W&B also violated Section 10A(a)(2) of the Exchange Act [15 U.S.C. § 78j-1], which requires each audit of an issuer to include procedures designed to identify related-party transactions that were material to the financial statements of the shell companies or otherwise required disclosure therein.  W&B also violated Rule 2-02(b)(1) of Regulation S-X [17 C.F.R. § 210.2-02], which requires that an accountant's report state whether the audit was made in accordance with generally accepted auditing standards.

11.     Based on these violations, the Commission seeks permanent injunctive relief, together with disgorgement of ill-gotten gains and prejudgment interest thereon, against Weinberg and W&B.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v] and Sections 21 and 27 of the Exchange Act [15 U.S.C. §§ 78u and 78aa].

13.     Venue is proper in this judicial district pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because certain of the acts and omissions constituting violations alleged herein, including the filing of documents with the

Commission at issue in this Complaint, occurred in this judicial district and the allegations relate to offers or sales of securities in this district.

14.     Weinberg and W&B, directly and indirectly, made use of the mails and of the means and instrumentalities of interstate commerce in connection with the transactions, acts, practices, and courses of business described in this Complaint.

## DEFENDANTS

15.     **Weinberg & Baer LLC** was, during all relevant times, a Maryland limited liability company and PCAOB-registered public accounting firm based in Baltimore, Maryland.  During all relevant times, W&B had two partners (Weinberg and another individual) and no other accountants. W&B formerly was known as "Alan Weinberg CPA," which was registered with the PCAOB in December 2007.

16.     **Alan Weinberg**, age 60, resides in Israel and was, during all relevant times, a CPA licensed in Maryland and a partner in W&B.  During all relevant times, Weinberg owned at least 98.5 percent of W&B.

## FACTS

### I.     The Perlstein Group's Fraudulent Shell Factory

17.     Between 2010 and 2014, the Perlstein Group created at least fifteen shell companies, including: Aquino Milling, Inc., now known as AV Therapeutics, Inc.; Duane Street Corp., now known as Cur Media; Eco Planet Corp., now known as J.E.M. Capital Ltd.; Epsilon Corp., now known as Gase Energy, Inc.; Flaster Corp.; iLoan, Inc.; Instride, Inc.; L3 Corp., now known as Praetorian Property, Inc.; Lollipop Corporation; Marathon Bar Corporation, now known as Lipocine, Inc.; Olie, Inc., now known as Syndicate Business Development Corporation; Olivia Inc., now known as Bio-En Holdings Corporation; Secure It Corporation, now known as Black Stallion

Oil and Gas, Inc.; Universal Tech Corporation, now known as Bay Stakes Corporation; and Zubra Inc.

18.     The Perlstein Group followed essentially the same process in creating each of these shell companies:

19.     The Perlstein Group formed a United States corporation, issued stock to nominee officers and directors, and created a phony business plan for the corporation.

20.     The Perlstein Group then engaged an attorney to assist in drafting filings with the Commission and hired an accounting firm to perform what would often be a sham audit.

21.     The Perlstein Group prepared S-1 registration statements for the shell companies, caused them to be filed with the Commission, and attempted to address comments from the Commission staff.

22.     Each S-1 registration statement claimed that the named corporation had a specified business plan.  Yet the S-1 registration statements filed with the Commission by each shell corporation concealed that: (a) the Perlstein Group had formed and solely controlled each corporation; (b) the Perlstein Group had created each corporation solely to sell it; (c) the Perlstein Group never intended to execute the business plan provided for each corporation; and (d) for each corporation, the Perlstein Group had installed nominee officers, directors, and shareholders whom the Perlstein Group controlled.

23.     After a shell corporation's registration statement was declared effective, the Perlstein Group orchestrated a phony initial public offering of the corporation's shares.  To accomplish this, the Perlstein Group typically sought approximately forty straw-man shareholders for each shell so that the company would not appear to be controlled by only a few individuals because the Perlstein Group thought that would be a red flag for regulators, including the Commission.

24.    The Perlstein Group signed a contract with a transfer agent on behalf of the shell by using the digital signature of one of the shell's nominee directors.  The Perlstein Group then sent a purported shareholder list to the transfer agent.

25.    The Perlstein Group — acting in the guise of one of the shell's nominee officers or directors — instructed the transfer agent to print stock certificates and a certified shareholder list and to send these documents to one of the corporation's purported officers or directors.

26.    To maximize the value of the shell to potential buyers, the Perlstein Group tried to make each shell's publicly-held shares eligible to trade in the over-the-counter market.  To accomplish this, Perlstein and Yaron arranged for a registered broker-dealer to file a 15c2-11 application ("211 Application") with the Financial Industry Regulatory Authority ("FINRA"), in order obtain a ticker symbol for the company's stock, allow the broker-dealer to publish quotes for the shell company's stock, and enable public trading of the stock.

27.    After FINRA had approved the 211 Application and assigned a ticker symbol to the shell corporation, the Perlstein Group filed applications on behalf of the issuers with The Depositary Trust Company to obtain "DTC eligibility," which enhances the value of the shell to buyers because the securities can be distributed quickly and efficiently.  DTC eligibility allowed the shares to be held in street name and traded electronically, which eliminated the need for brokers to physically transfer paper share certificates.

28.    As part of this process, the Perlstein Group sought to create the appearance of investor interest and active trading in the shell company's stock, in order to establish a price for the stock.  To accomplish this, Perlstein orchestrated phony trades by selling shares in one account he controlled and purchasing the same shares in another account he controlled.  This not only established a price for the stock, but also allowed him to maintain control of the traded shares.

29.    The Perlstein Group's ultimate goal was to sell the shell for a significant profit, usually through a reverse merger or a stock sale, to a buyer seeking a shell company with publicly-traded shares.

30.    The Perlstein Group collectively profited by over $1.8 million from selling shell corporations that they had created.

31.    By engaging in the conduct described above, Perlstein, Swartz, and Yaron violated the anti-fraud provisions of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## II.    Weinberg's and W&B's Substantial Assistance of the Perlstein Group's Fraud

32.    Weinberg had a relationship with Perlstein since 2005, when he first met Perlstein in Israel.  From approximately 2005 through 2007, Perlstein retained Weinberg to prepare financial statements for several development stage companies.

33.    In 2007, Perlstein suggested that Weinberg register with the PCAOB, so that he could conduct audits and interim reviews for companies registered with the Commission.

34.    In December 2007, Weinberg registered "Alan Weinberg CPA" with the PCAOB, and began offering audit services.  One of Weinberg's first clients as an auditor was a shell company with which Perlstein was involved.

35.    In April 2010, Weinberg changed the name of the firm to Weinberg & Baer LLC.

36.    From 2011 through 2014, Perlstein and Yaron paid Weinberg to conduct audits and interim reviews of the financial statements of at least seven of the shell companies, including: Aquino Milling, Inc.; Eco Planet Corp.; Epsilon Corp.; Flaster Corp.; iLoan, Inc.; L3 Corp.; and Marathon Bar Corp.  Weinberg understood that Yaron worked with Perlstein.

37.    Audited financial statements were required for the shell companies' S-1 registration statements and annual reports.

38.     Weinberg and W&B knowingly or recklessly assisted the Perlstein Group in carrying out their fraud by issuing clean audit reports for at least seven of the shell companies, despite numerous audit failures and red flags that should have alerted them that they were enabling a fraud.

39.     As alleged below, during his audits of the shell companies, Weinberg repeatedly failed to adhere to PCAOB Standards.  Weinberg and W&B, however, issued numerous audit reports falsely stating that those audits had been performed in accordance with PCAOB Standards.

40.     The Perlstein Group paid W&B (ostensibly from the shell companies' bank accounts) approximately $56,000 for auditing the shell companies.

## III.     Weinberg's and W&B's Intentional or Reckless Conduct

41.     In course of his audits of the shell companies, Weinberg became aware, or was reckless in not knowing, that the Perlstein Group was committing fraud.

42.     Weinberg recklessly ignored numerous red flags that should have alerted him that the purported directors and officers of the shell companies did not act in those capacities and that the shell companies that he was auditing were controlled by the Perlstein Group.

43.     Weinberg never met or spoke (or even attempted to meet or speak) directly with the purported directors and officers of at least six of the shell companies.  Instead, Weinberg occasionally sent emails to the shell companies' corporate email addresses, which had been provided to Weinberg by the Perlstein Group.

44.     When assessing the risk of fraud during his audits of at least three of the shell companies, Weinberg interviewed only either Yaron or a supposed "consultant" to those companies, rather than the companies' purported management.  Yaron, however, was never a consultant to those companies and was never interviewed by anyone from W&B.

45.     Weinberg discussed and agreed on his fees for this work with Perlstein, rather than with the purported management of each shell company.

46.    Weinberg never asked Perlstein or Yaron what their roles were with the shell companies.

47.    Weinberg was hired by the Perlstein Group to perform audits for six of the shell companies over a period of approximately four months in late 2011 and early 2012.  The short time-frame within which Weinberg was asked to conduct the audits of multiple companies, each with little or no assets or business activity, was a red flag that should have caused Weinberg to inquire into the Perlstein Group's involvement with those companies.

48.    The Perlstein Group was the primary conduit through which Weinberg communicated with, and obtained key information about, the shell companies, including engagement letters and management representation letters that purportedly had been signed by the companies' respective CEOs, along with other documents necessary to conduct the audits.

49.    Weinberg generally directed any questions that he had regarding the audits to Yaron, rather than to the purported officers of the shell companies.  Weinberg never asked why Yaron or other members of the Perlstein Group — rather than the shell companies' purported directors and officers — were communicating with him and providing information on behalf of the shell companies regarding the audits.

50.    Documents received by Weinberg during his audits of several of the shell companies clearly indicated that Perlstein had significant involvement with those companies.

51.    In February 2012, Weinberg sent Perlstein, and not the officers or directors of any of the shell companies, instructions on how to wire funds to his bank account.

52.    In October 2013, Weinberg forwarded Perlstein a copy of an article about an action that the Commission had brought against certain auditors for improper professional conduct in

auditing shell companies, telling Perlstein: "See below the things the SEC is looking [sic] to catch auditors.  We comply with the standards."

53.     On multiple occasions, Weinberg emailed Perlstein directly with questions or comments concerning the audits of at least three of the shell companies, suggesting that Weinberg knew that Perlstein had the power to direct and control those companies.

54.     Weinberg also received materials from one shell company stating that Perlstein had initially been the company's sole director, but had recently "resigned" and been replaced with a new sole director and officer.  Weinberg also received records showing that Perlstein later invoiced that company for thousands of dollars in "consulting fees."

55.     At the time of Weinberg's audits, none of the shell companies had more than minimal operations, assets, or revenues, or had made significant progress toward executing their purported business plans.

56.     Weinberg, however, never asked the purported directors and officers — or any member of the Perlstein Group for that matter — why the shell companies failed to make any significant progress toward their business plans.

57.     Weinberg did not take any steps to determine whether the Perlstein Group's apparent authority with regard to the shell companies derived from the named directors and officers or whether the members of the Perlstein Group were, in fact, the shell companies' control persons.

## IV.     Weinberg's and W&B's Violations of PCAOB Standards

58.     During several of W&B's audits of the shell companies, W&B's client-acceptance policies, as required by QC Section 20 (System of Quality Control for a CPA Firm's Accounting and Auditing Practice) ("QC 20") of PCAOB Standards, were deficient.  (All references to PCAOB Standards in this Complaint are to standards in effect at the time of the alleged misconduct.)

      a.    W&B repeatedly failed to undertake steps to verify the integrity, identity, and reputation of the shell companies' managements.

      b.    W&B had no process in place for determining the identity and business reputation of the shell companies' key officers, related parties, or board of directors.

59.    During several of their audits of the shell companies, Weinberg and W&B failed to exercise due professional care and professional skepticism, as required by AU Section 230 (Due Professional Care in the Performance of Work) ("AU 230") of PCAOB Standards.

      a.    As alleged above, Weinberg knew, or was reckless in not knowing, that the Perlstein Group controlled the shell companies.

      b.    Weinberg's failure to exercise due professional care and professional skepticism in the face of such red flags indicating that the Perlstein Group controlled the shell companies was an extreme departure from auditing standards.

60.    During several of their audits of the shell companies, Weinberg and W&B failed to properly audit related-party transactions, and failed to include procedures designed to provide reasonable assurances of identifying related-party transactions, as required by AU Section 334 (Related Parties) ("AU 334") of PCAOB Standards.

      a.    Weinberg failed to request from appropriate management personnel the names of all related parties and inquire whether there were any transactions with these parties during the period.

      b.    As alleged above, the Perlstein Group controlled the shell companies and engaged in material, related-party transactions with the shell companies.

   c. Weinberg's and W&B's audits lacked adequate procedures to ensure that those related-party transactions were disclosed as such by the shell companies in the financial statements that were the subject of the audits.

   d. Weinberg and W&B also failed to appropriately design procedures to identify the shell companies' related-party transactions.

   e. As alleged above, instead of insisting on meeting or speaking by telephone with the shell companies' purported directors and officers, Weinberg routinely relied on information supplied by members of the Perlstein Group, none of whom had been identified as management, control persons, or related parties in the shell companies' filings with the Commission.

   f. Although Weinberg knew that the members of the Perlstein Group had at least some role with regard to each of the shell companies — and were collecting and sending materials to, and communicating with, Weinberg regarding the preparation of the shell companies' filings with the Commission — Weinberg never questioned the Perlstein Group's fee arrangement with the shell companies or sufficiently evaluated whether Perlstein was a related party.

61. During several of their audits of the shell companies, Weinberg and W&B failed to maintain sufficient audit documentation, as required by AS No. 3 (Documentation) ("AS 3") of PCAOB Standards.  In particular, Weinberg failed to prepare documentation in sufficient detail to show that audit procedures had been performed or to provide a clear understanding of conclusions reached.

62. Weinberg and W&B issued clean audit reports for at least seven of the shell companies, despite numerous audit failures and red flags that should have alerted them that they

were enabling a fraud.  In doing so, Weinberg and W&B intentionally or recklessly provided substantial assistance to the Perlstein Group in perpetrating their fraud.

## FIRST CLAIM FOR RELIEF

### Aiding and Abetting Violations of Sections 17(a) of the Securities Act
### (Weinberg and Weinberg & Baer LLC)

63.     Paragraphs 1 through 62 are realleged and incorporated by reference herein.

64.     As alleged above, the Perlstein Group violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

65.     Weinberg and W&B knowingly or extremely recklessly provided substantial assistance to the Perlstein Group's violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].  Weinberg and W&B knew or were extremely reckless in not knowing that the Perlstein Group's conduct and the substantial assistance that they provided the Perlstein Group in perpetrating the violations were improper.

66.     By engaging in the conduct described above, Weinberg and W&B aided and abetted violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)], and, unless enjoined, are reasonably likely to continue their violative conduct.

## SECOND CLAIM FOR RELIEF

### Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (Weinberg and Weinberg & Baer LLC)

67.     Paragraphs 1 through 62 are realleged and incorporated by reference herein

68.     As alleged above, the Perlstein Group violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

69.     Weinberg and W&B knowingly or extremely recklessly provided substantial assistance to the Perlstein Group's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].  Weinberg and W&B knew or were extremely reckless in not knowing that their conduct and the substantial assistance that they provided to the Perlstein Group in perpetrating the violations were improper.

70.     By engaging in the conduct described above, Weinberg and W&B aided and abetted violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], and, unless enjoined, are reasonably likely to continue to their violative conduct.

## THIRD CLAIM FOR RELIEF

### Violations of Section 10A(a)(2) of the Exchange Act
### (Weinberg and Weinberg & Baer LLC)

71.     The Commission repeats and re-alleges Paragraphs 1 through 62 of the Complaint.

72.     As alleged above, the Perlstein Group controlled the shell companies and engaged in material, related-party transactions with the shell companies.

73.     In their audits of the shell companies, Weinberg and W&B failed to include procedures designed to identify related-party transactions that were material to the financial statements of the shell companies or otherwise required disclosure therein.

74.     By engaging in the conduct described above, Weinberg and W&B violated Section 10A(a)(2) of the Exchange Act [15 U.S.C.§ 78j-1(a)(2)], and unless enjoined, are reasonably likely to continue their violative conduct.

## FOURTH CLAIM FOR RELIEF

### Violations of Regulation S-X Rule 2-02(b)(1)
### (Weinberg &Baer LLC)

75.     The Commission repeats and re-alleges Paragraphs 1 through 62 of the Complaint.

76.     W&B's audit reports stated that W&B had conducted its audits of the shell companies in accordance with PCAOB Standards.  W&B, however, repeatedly failed to conduct those audits in accordance with PCAOB standards.

77.     By engaging in the conduct described above, W&B violated Regulation S-X Rule 2-02(b)(l) [17 C.F.R. § 210.2-02(b)(l)], and unless enjoined, is reasonably likely to continue its violative conduct.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court:

A.     Permanently enjoin Weinberg and Weinberg & Baer LLC from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

B.     Permanently enjoin Weinberg and Weinberg & Baer LLC from violating Sections 10(b) and 10A(a)(2) of the Exchange Act [15 U.S.C. §§ 78j(b), 78j-l(a)(2)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

C.     Permanently enjoin Weinberg & Baer LLC from violating Regulation S-X Rule 2-02(b)(l) [17 C.F.R. §§ 210.2-02(b)(l)];

D.     Order Weinberg and Weinberg & Baer LLC to pay jointly and severally disgorgement, with prejudgment interest, of all ill-gotten gains received as a result of the conduct alleged in this Complaint;

E.     Grant such other and further relief as the Court deems just and appropriate; and

F.      Retain jurisdiction of this action in accordance with the principles of equity and

the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders

and decrees that may be entered, or to entertain any suitable application or motion for additional

relief within the jurisdiction of this Court.


Date:   February 16, 2018                    ___/s/ Daniel J. Maher
                                             Daniel J. Maher, Mass. Bar No. 654711
                                             Securities and Exchange Commission
                                             100 F Street, NE
                                             Washington, D.C. 20549
                                             Tel: (202) 551-4737
                                             Fax: (202) 772-9292
                                             Email: maherd@sec.gov

Of Counsel:
Antonia Chion
        District of Columbia Bar No. 358014
Yuri B. Zelinsky
        Maryland Bar No. 8105010278
Greg Hillson
        District of Columbia Bar No. 1000935
Securities and Exchange Commission